UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DAVID PAUL READ,

               Petitioner,

   -v-

SUPERINTENDENT MR. THOMPSON, *Collins Correctional Facility*,

               Respondent.

No. 13-CV-3661 (KMK) (PED)

<u>ORDER ADOPTING REPORT &
RECOMMENDATION</u>

---

<u>Appearances</u>:

David Paul Read
Sonyea, NY
*Petitioner*

Michelle Elaine Maerov, Esq.
Office of New York State Attorney General
New York, NY
*Counsel for Respondent*

KENNETH M. KARAS, District Judge:

      Petitioner David Paul Read ("Petitioner"), proceeding pro se, files this Amended Petition

for a Writ of Habeas Corpus (the "Petition") pursuant to 28 U.S.C. § 2254, challenging his

conviction for criminal contempt in the first degree, in violation of N.Y. Penal Law

§ 215.51(b)(v). (*See* Am. Pet. Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in

State Custody ("Am. Pet.") ¶ 5 (Dkt. No. 13); Resp't's Mem. of Law in Opp'n to the Pet. for a

Writ of Habeas Corpus ("Resp't's Mem.") 1 (Dkt. No. 27).)

      The case was referred to Magistrate Judge Paul E. Davison, who issued a Report and

Recommendation (the "R&R"), recommending that the Court deny the Petition. (*See* R&R (Dkt.

No. 54).) Petitioner subsequently filed timely objections to the R&R (the "Objections"), which

the Court has considered.  Subject to the discussion below, the Court adopts the R&R and denies Petitioner's request for habeas relief.

## I.  Background

The factual and procedural background of this case is set forth in the thorough R&R and the Court assumes the Parties' familiarity therewith.  (*See* R&R 2–13.)  The Court nevertheless summarizes the facts relevant to this Order.

On August 30, 2006, in the Town of Clarkstown Justice Court, Judge Victor J. Alfieri, Jr. issued a three-year order of protection (the "Order of Protection") that required Petitioner to refrain from engaging in "assault, stalking, harassment, menacing, reckless endangerment, disorderly conduct, intimidation, threats, or any criminal offense" against his wife, Michelle Surdak Read ("Ms. Read").  (*See* Answer in Opp'n to the Pet. for a Writ of Habeas Corpus ("Answer") Ex. I (Dkt. No. 27); Aug. 12, 2010 Trial Tr. 36–41 (Dkt. No. 28).)[1]

By indictment number 261/2009 (the "Indictment"), a Rockland County grand jury charged Petitioner with two counts of criminal contempt in the first degree after Petitioner harassed and threatened to kill Ms. Read in violation of the Order of Protection.  (Resp't's Mem. 1; *see also* Answer Ex. G.)  On June 12, 2009, the District Attorney provided Petitioner a Bill of Particulars disclosing the locations of the two counts of the Indictment.  (*See* Answer Ex. H.) Count One was identified as having occurred at 35 Park Ave., in Suffern, New York, and Count Two was identified as having occurred at the Suffern Police Department.  (*Id.* at 1.)

On October 21, 2009, the trial court held a combined *Dunaway/Huntley* hearing.  A week later on October 28, 2009, the trial court stated:

> This entire case has proven to be very disturbing to this Court . . . . I reviewed the grand jury minutes . . . and I compared them with the testimony of the officers before the court,

---

[1] All cited state court trial transcripts are filed at Dkt. No. 28.

and I note there are substantial differences.  Differences upon which this court made a decision on the case when I found that the grand jury minutes were sufficient to establish the reasonableness to charge this defendant, and I now find myself confronted with what I used in front of the court to make that decision at some point in time became vastly different, which is deeply troubling to this court that testimony could change so drastically from the grand jury presentation to the presentation made to this court.  I may reconsider my decision on the grand jury minutes when I now read testimony put forward before this court by the police officers and compare them to the grand jury minutes of the police officers, and I, frankly, am disturbed that I even have to do that to be honest.  So at this point in time I am going to set this matter down for trial, and we will go forward with the trial unless I reconsider my original ruling on the grand jury minutes.

(Answer Ex. A (Appellant's Br. on Appeal ("Appellant's Br.")) 13–14 (alterations in original).)

Ultimately, however, the trial court did not change its ruling with regard to the validity of the

Indictment.  (*Id.* at 14.)

In a written opinion dated the same day, the trial court granted Petitioner's motion to

suppress his statements made in the presence of law enforcement.  (*See* Motion to be Released,

Rule 23(a) FRAP at unnumbered 8–16 (Dkt. No. 56).)  On June 22, 2010, the Appellate

Division, Second Department, reversed the suppression order on the law.  *See People v. Read*,

904 N.Y.S.2d 147, 148 (App. Div. 2010).

As summarized by Magistrate Judge Davison, police officers testified at trial that on

April 27, 2009, Ms. Read called 911 several times to complain about an incident involving

Petitioner.  (R&R 3.)  They further testified that police officers arrived at an apartment shared by

Petitioner and Ms. Read at 35 Park Ave. and that upon arrival, the officers observed Petitioner

shout obscenities at Ms. Read, blame her for his forthcoming incarceration, and threaten to kill

her.  (*Id.*)  Petitioner was arrested after officers determined that the Order of Protection remained

in effect.  (*Id.* at 3–4.)  Petitioner was taken to the police station, where Ms. Read later arrived to

complete a supporting deposition.  (*Id.* at 4.)  While confined to his cell, Petitioner continued to

scream at Ms. Read and threatened to kill her upon his release.  (*Id.*)  Three witnesses testified to

Petitioner's harassment and the threatening statements he directed towards Ms. Read at the police station: Sergeant John Gloede, Officer James Giannettino, and 911 dispatcher Colleen Mueller. (*See* Resp't's Mem. 6.)

On August 17, 2010, the jury sent a note indicating that it had reached a unanimous verdict on Count Two, related to the incident at the Suffern Police Department, but was deadlocked on Count One, related to the incident at 35 Park Ave. (Resp't's Mem. 8.) The prosecution agreed to dismiss the deadlocked Count One if the jury had reached a guilty verdict on Count Two. (*Id.*) The jury then announced that it had found Petitioner guilty of Count Two. (*Id.*) As agreed, Count One was then dismissed. (*Id.*)

On December 15, 2010, the trial court sentenced Petitioner to an indeterminate term of two to four years, taking into account Petitioner's 22 prior convictions and his "long history of domestic violence." (Dec. 15, 2010 Sentencing Tr. 47, 49.) The sentence was ordered to run consecutively with a three and a half to seven-year term imposed in a separate case. (*Id.* at 48–49.)[2]

Petitioner asserts that shortly after his conviction he attempted to file a motion to vacate the judgment under N.Y. Crim. Proc. Law § 440.10. Included with the Petition is a document claiming that "[o]n October 25, 2010 . . . [P]etitioner . . . submitted to the . . . Rockland County Supreme [C]ourt . . . [a] motion under CPL 440.10." (*See* Am. Pet. Part 1 Ex. A, at 1 (Dkt. No.

---

[2] Petitioner was sentenced on that same day for convictions stemming from a July 31, 2008 domestic violence incident also involving Ms. Read. The two cases were consolidated for purposes of sentencing and appeal. Petitioner filed a separate habeas petition, docketed as *Read v. Thompson*, No. 13-CV-6962, challenging his conviction arising from the July 31, 2008 incident. That petition is addressed in a separate Report and Recommendation from Magistrate Judge Davison and will be addressed by this Court in a separate order.

4

13-2).)[3]  Attached is a letter dated October 25, 2010 from the Rockland County trial judge's law

secretary (the "October 25, 2010 Letter" or "Letter") which states: "I am returning your recently-

submitted papers to you.  In addition to the fact that your papers are deficient and the motion

premature (you have not yet been sentenced), Judge Nelson will not entertain any pro se motions

while you are represented by counsel."  (*Id.* at 2 (italics omitted).)

Petitioner contends that the Letter, which does not include any underlying motion or

briefing and does not specify whether it relates to a § 440.10 motion or some other motion or

filing entirely, "show[s] diligent effort," and claims that "[a]ll issues raised her[e]in Habeas

Corpus petition was raised to this court."  (*Id.* at 1.)  Petitioner also sent a letter to the Court

asking, in part, "would it be required for me to [exhaust] this with going [through]

motions . . . [s]uch as [§] 440.10 CPL[] state motion.  The county will reject this as they did in

the past."  (Letter from Petitioner to Court (July 26, 2013) at unnumbered 2 (Dkt. No. 11).)[4]

---

[3] The Petition contains a pre-printed amended petition form as well as voluminous attachments Petitioner has identified as Parts 1, 2, and 3, each containing its own exhibits.  Due to ECF space limitations, the attachments appear on the docket as separate exhibits, spanning from Dkt. No. 13 to Dkt. No. 13-12.  Specifically, Petitioner's attachments appear on the docket as follows:

Part 1: "Changed Testimony[,] Wrongfully Convicted, Ineffective Counsel" (Dkt. No. 13-1 through Dkt. No. 13-9) (hereinafter "Part 1");

Part 2: "The Restraining Order" (Dkt. No. 13-10) (hereinafter "Part 2"); and

Part 3: "Missing Witness Charge Petitioner's Petition" (Dkt. No. 13-11) (hereinafter "Part 3").

The Petition also includes "Petitioner[']s [W]itness Statement for Habeas Corpus [R]elief" (Dkt. No. 13-12) (hereinafter "Witness Statement").

For ease of reference, the Court's citations to the Petition will reference the relevant "Part" of the Petition and the page number, or exhibit, within that Part.  If the Court cites to an exhibit from Part 1, which spans eight separate docket entry attachments, the Court will add the relevant docket entry to the citation (e.g., Am. Pet. Part 1 Ex. 20 (Dkt. No. 13-5)).

[4] The Petition asserts that each ground listed therein was raised in the § 440.10 motion and that the court "denied []his application."  (*See, e.g.*, Am. Pet. ¶ 12 (Ground One) (d)(7) ("I

Petitioner filed additional papers referencing the motion and later submitted pages from

Rockland County Court dockets related to the Indictment. (*See* Dkt. No. 46; *see also* Dkt. Nos.

44, 45.) As Magistrate Judge Davison noted, "[n]one of these documents [filed by Petitioner]

establish whether [P]etitioner in fact filed, or attempted to file, a § 440.10 motion, nor do they

shed light on what claims may have been presented therein." (R&R 5.) Regarding the latter

point, Petitioner again stresses in his Objections that "all [his] claims argued in this Petition were

argued in [his] sec. 440.10 [motion]." (Objection to R&R ("Pet'r's Obj's II") 4 (Dkt. No. 60).)

In any event, there is no indication that Petitioner ever sought any form of relief from the

Appellate Division with respect to any such motion.

Petitioner, through his counsel, timely filed an appeal in the Appellate Division, Second

Department. (*See* Appellant's Br.) In this appeal, Petitioner raised the following arguments: (1)

the trial court erred in denying Petitioner a "missing witness" charge with regard to Ms. Read;

(2) the prosecution failed to turn over grand jury minutes as *Rosario* material to the defense; and

(3) trial counsel rendered ineffective assistance of counsel when he failed to demand production

of the grand jury testimony of prosecution witnesses at trial. (*Id.* at 27–34; *see also* Answer

Ex. B (Br. for Resp't); Answer Ex. C (Appellant's Reply Br.).)[5]  On July 11, 2012, the Second

---

was denied this application. The court said they would not entertain a 440.10 motion. I waited
for my direct appeal to deal with this matter.").)

   [5] As noted by Magistrate Judge Davison, by letter dated February 18, 2014, Petitioner
submitted a copy of a document entitled "Supplimental Breif" [sic], bearing the caption and
docket number of his direct appeal; the cover letter provided to this Court describes the
document as "tangible evidence of Petitioner's lay-person efforts to give a supplimentale [sic]
brief to the appell[ate] court, as well as appellant[']s attorney." (Submission of Evidence at
unnumbered 1, 8 (Dkt. No. 31).) As Magistrate Judge Davison concluded, there is no indication
that the document was actually submitted to or considered by the Appellate Division and even if
it had been properly filed in connection with Petitioner's direct appeal, the document cannot be
construed as having exhausted any additional claims because no corresponding application for
leave to appeal was submitted to the New York Court of Appeals. (*See* R&R 6 n.7.)

Department affirmed Petitioner's judgment of conviction. *See People v. Read*, 947 N.Y.S.2d

614 (App. Div. 2012). Petitioner, through his counsel, timely submitted an application for leave

to appeal to the New York Court of Appeals. With respect to the instant Petition, the application

sought review of *only* the question of whether the trial court erred in denying Petitioner a missing

witness charge with regard to Ms. Read. (Answer Ex. E (Appl. for Certification) 9–10.) The

Court of Appeals denied Petitioner leave to appeal. *See People v. Read*, 978 N.E.2d 113 (N.Y.

2012).

On or about May 20, 2013, the Petitioner, proceeding pro se, filed his initial petition for a

writ of habeas corpus. (*See* Habeas Corpus Pet. (Dkt. No. 1).) Finding that the 500-page petition

did not comply with Rule 2 of the Rules Governing Section 2254 Cases, this Court directed

Petitioner to file an amended petition in which Petitioner was required to "succinctly and clearly

state each of his grounds for relief, and . . . detail what steps he has taken to exhaust them fully in

the New York courts." (Order to Amend 2–4 (Dkt. No. 9).) The Order to Amend attached a

printed amended petition form, which Petitioner was directed to complete. (*Id.* at 4.)

As explained by Magistrate Judge Davison, Petitioner's instant Petition, filed in response

to the Court's Order to Amend, may superficially comply with the Court's Order, but in

substance, Petitioner failed to succinctly and clearly state each of his grounds for relief, and

detail what steps he has taken to exhaust them. (R&R 8.)[6] In addition to the amended petition

form, Petitioner submitted voluminous attachments so large that, due to ECF space limitations,

the attachments appear on the docket as 12 separate exhibits. (*Id.*; *see also* Dkt. No. 13.) In all,

the Petition is approximately 552 pages in length. Beyond the Petition, Petitioner continued to

---

[6] Additionally, the Court notes that there are inaccuracies in some of Petitioner's answers
in the pre-printed amended petition form. For example, Petitioner's list of the grounds raised on
appeal is grossly inaccurate. (*See* Am. Pet. ¶ 9(f), (g)(6).)

submit supposed evidence and other materials to the Court on a piecemeal basis, (*see, e.g.*, Dkt.

Nos. 14, 31, 34, 44, 45, 46, 47, 49, 51, 52), with most of those submissions occurring after

Petitioner was directed not to submit additional materials without leave of the Court, (*see* Dkt.

No. 33). Magistrate Judge Davison's R&R details at length a number of these submissions,

including the dozens of "exhibits"—most of questionable relevance—attached to each

submission. (*See* R&R 9–12.)[7]  As aptly summarized by Magistrate Judge Davison, "[a]s a

whole, [P]etitioner's submissions are prolix, rambling, and repetitive and are notable for their

lack of structure, indiscriminate insertion of exhibits, and conclusory allegations of wrongdoing."

(*Id.* at 9.)

Despite the challenges associated with review of such an incoherent Petition, Magistrate

Judge Davison undertook a careful review of the papers and construed the Petition as seeking

habeas relief on the following grounds:  (1) the prosecution improperly withheld material from

Petitioner that was discoverable under *People v. Rosario*, 173 N.E.2d 881 (N.Y. 1961); (2)

Petitioner's conviction was based on false evidence and perjured testimony; (3) the Order of

Protection was invalid; (4) the trial court erred in denying Petitioner a missing witness charge;

(5) trial counsel was ineffective for failing to raise the aforementioned claims; and (6) appellate

counsel was ineffective for failing to assert that Petitioner's conviction was based on false

testimony and that the Order of Protection was invalid.  (R&R 9.)  Respondent filed his response

on February 11, 2014, (*see* Resp't's Mem.), and Petitioner filed his reply on March 3, 2014, (*see*

Pet'r's Opp'n to Resp't's Answer ("Pet'r's Reply") (Dkt. No. 32)).

---

[7] Petitioner also has placed several telephone calls to Magistrate Judge Davison's
chambers and this Court's chambers.

Magistrate Judge Davison issued the R&R on October 8, 2015, recommending that this Court deny Petitioner's request for relief and dismiss the Petition in its entirety. (*See* R&R 2.) Petitioner requested an extension of time to submit his Objections to the R&R, which the Court granted on October 19, 2015, providing an extension which rendered the Objections due November 19, 2015. (*See* Dkt. No. 57.) Petitioner subsequently filed his Objections on a piecemeal basis to this Court. (*See* Objection in Opp'n to the Writ of Habeas Corpus R&R ("Pet'r's Obj's I") (Dkt. No. 59); Pet'r's Obj's II; Habeas Corpus ("Pet'r's Obj's III") (Dkt. No. 64); Opp'n to R&R Final Briefing ("Pet'r's Obj's IV") (Dkt. No. 65).)[8]

Petitioner also filed with the Court of Appeals a petition for a writ of mandamus directing the Court to rule on his Petition. On September 21, 2015, the Second Circuit denied Petitioner's mandamus petition without prejudice, but nonetheless directed action by this Court within 30 days. (*See* Dkt. No. 50.) Subsequently, in connection with the same mandamus petition, the Second Circuit issued another order denying Petitioner's mandamus petition without prejudice. (*See* Dkt. No. 66.)[9]

---

[8] The Court also received an undated letter, docketed on November 2, 2015, purportedly from Ms. Read which states that she is willing to "testify in . . . chambers on behalf of [her] husband" to establish that he did not engage in the acts underlying his conviction, (*see* Dkt. No. 62), and a document entitled "Acknowledgment of Defect" in which Petitioner once again questions the validity of the Order of Protection, (*see* Dkt. No. 58).

[9] The Court understands Petitioner's legitimate desire to have his Petition adjudicated as quickly as possible. Nevertheless, as Petitioner points out in a filing in his related habeas proceeding, "[q]uick adjudication should not . . . be at the expen[s]e of a[] []complete review." (Pet'r's Reply to Resp't's Answer 4 (Dkt. No. 19, 13-CV-6962 Dkt.).) Petitioner's filings in both of his habeas actions were extensive and disjointed, making review of his petitions particularly challenging. The Court has made its best effort to thoroughly review the filings and adjudicate the petitions in a timely manner.

## II.  Discussion

### A.  Applicable Law

#### 1.  Standard of Review

A district court reviewing a report and recommendation addressing a dispositive motion "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). Under 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72(b), a party may submit objections to the magistrate judge's report and recommendation. The objections must be "specific" and "written," Fed. R. Civ. P. 72(b)(2), and must be made "[w]ithin 14 days after being served with a copy of the recommended disposition," *id.*; *see also* 28 U.S.C. § 636(b)(1), plus an additional three days when service is made pursuant to Federal Rules of Civil Procedure 5(b)(2)(C)-(F), *see* Fed. R. Civ. P. 6(d), for a total of seventeen days, *see* Fed. R. Civ. P. 6(a)(1).

"A district court evaluating a magistrate judge's report may adopt those portions of the report [and recommendation] to which no 'specific, written objection' is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law." *Adams v. N.Y. State Dep't of Educ.*, 855 F. Supp. 2d 205, 206 (S.D.N.Y. 2012) (internal quotation marks omitted), *aff'd sub nom. Hochstadt v. N.Y. State Educ. Dep't*, 547 F. App'x 9 (2d Cir. 2013). In contrast, where a party timely submits objections to a report and recommendation, as Petitioner has done here, the district court reviews de novo the parts of the report and recommendation to which the party objected. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3). "When a [petitioner] simply rehashes the same arguments set forth in [his] original petition, however, such objections do not suffice to invoke de novo review of the [r]eport." *Aponte v. Cunningham*, No. 08-CV-6748, 2011 WL 1432037, at *1

(S.D.N.Y. Apr. 11, 2011) (italics omitted); *see also Hall v. Herbert*, No. 02-CV-2300, 2004 WL 287115, at *1 (S.D.N.Y. Feb. 11, 2004) ("[T]o the extent that a party simply reiterates his original arguments, the [c]ourt reviews the report and recommendation only for clear error.").

Finally, pleadings submitted by pro se litigants are held to a less strict standard than those drafted by attorneys. *See Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 402 (2008) ("Even in the formal litigation context, pro se litigants are held to a lesser pleading standard than other parties." (italics omitted)). Because Petitioner is proceeding pro se, the Court construes his pleadings to raise the strongest arguments that they suggest. *See Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir. 2006) (per curiam).

### 2.  Habeas Corpus

#### a.  Standard of Review

Petitions for a writ of habeas corpus are governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which provides that "[t]he writ may not issue for any claim adjudicated on the merits by a state court unless the state court's decision was 'contrary to, or involved an unreasonable application of, clearly established Federal law as determined by the Supreme Court of the United States,' or was 'based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding.'" *Epps v. Poole*, 687 F.3d 46, 50 (2d Cir. 2012) (quoting 28 U.S.C. § 2254(d)(1)–(2)). In this context, "it is the habeas applicant's burden to show that the state court applied [federal law] to the facts of his case in an objectively unreasonable manner." *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam). "[A]n unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. 685, 694 (2002); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under

AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

Section 2254(d) "reflects the view that habeas corpus is a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102–03 (2011) (internal quotation marks omitted). Consequently, a federal court must deny a habeas petition in some circumstances even if the court would have reached a conclusion different than the one reached by the state court, because "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102; *see also Cullen v. Pinholster*, 563 U.S. 170, 203 (2011) ("Even if the [federal] Court of Appeals might have reached a different conclusion as an initial matter, it was not an unreasonable application of our precedent for the [state court] to conclude that [the petitioner] did not establish prejudice."); *Hawthorne v. Schneiderman*, 695 F.3d 192, 197 (2d Cir. 2012) ("Although we might not have decided the issue in the way that the [New York State] Appellate Division did—and indeed we are *troubled by the outcome we are constrained to reach*—we . . . must defer to the determination made by the state court . . . ." (emphasis added) (citation omitted)).

Additionally, under AEDPA, the factual findings of state courts are presumed to be correct. *See* 28 U.S.C. § 2254(e)(1); *Nelson v. Walker,* 121 F.3d 828, 833 (2d Cir. 1997). The petitioner must rebut this presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Cotto v. Herbert*, 331 F.3d 217, 233 (2d Cir. 2003) (same). Finally, only federal law claims are cognizable in habeas proceedings. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the

12

Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67–68

(1991); *see also* 28 U.S.C. § 2254(a) ("The Supreme Court, a Justice thereof, a circuit judge, or a

district court shall entertain an application for a writ of habeas corpus in behalf of a person in

custody pursuant to the judgment of a State court only on the ground that he is in custody in

violation of the Constitution or laws or treaties of the United States.").

### b. Exhaustion

"Before seeking a federal writ of habeas corpus, a state prisoner must exhaust available

state remedies, thereby giving the State the opportunity to pass upon and correct alleged

violations of its prisoners' federal rights." *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citation

and internal quotation marks omitted); *see also* 28 U.S.C. § 2254(b)(1)(A) ("An application for a

writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court

shall not be granted unless it appears that . . . the applicant has exhausted the remedies available

in the courts of the State . . . ."). Accordingly, "the prisoner must fairly present his claim in each

appropriate state court (including a state supreme court with powers of discretionary review),

thereby alerting that court to the federal nature of the claim." *Baldwin*, 541 U.S. at 29 (internal

quotation marks omitted); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to

have exhausted the remedies available in the courts of the State, within the meaning of this

section, if he has the right under the law of the State to raise, by any available procedure, the

question presented."). This requirement reflects important "notions of comity between the

federal and State judicial systems." *Strogov v. Att'y Gen.*, 191 F.3d 188, 191 (2d Cir. 1999).

There are two components to the exhaustion requirement. *See McCray v. Bennet*, No. 02-

CV-839, 2005 WL 3182051, at *7 (S.D.N.Y. Nov. 22, 2005) ("A two-step analysis is used to

determine whether a claim has been exhausted . . . ."). "First, the petitioner must have fairly

presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts." *Klein v. Harris*, 667 F.2d 274, 282 (2d Cir. 1981), *overruled on other grounds, Daye v. Att'y Gen.*, 696 F.2d 186, 195 (2d Cir. 1982) (en banc); *see also Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir. 2001) (same); *Oliver v. Kirkpatrick*, No. 06-CV-6050, 2012 WL 3113146, at *5 (E.D.N.Y. July 31, 2012) (same). This requirement is satisfied if the claim is presented in a way that is "likely to alert the court to the claim's federal nature," *Daye*, 696 F.2d at 192, and the state courts are "apprised of both the factual and the legal premises of the claim [the petitioner] asserts in federal court," *Jones v. Vacco*, 126 F.3d 408, 413 (2d Cir. 1997) (alteration in original) (internal quotation marks omitted); *see also Bermudez v. Conway*, No. 09-CV-1515, 2012 WL 3779211, at *8 (E.D.N.Y. Aug. 30, 2012) (same). In other words, a state prisoner need not cite "chapter and verse of the Constitution" to satisfy this requirement. *Daye*, 696 F.2d at 194. However, it is "not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (citation omitted). Rather, the claims must be made in such a way so as to give the state courts a "fair opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim." *Id.* (internal quotation marks omitted).

"Second, having presented his federal constitutional claim to an appropriate state court, and having been denied relief, the petitioner must have utilized all available mechanisms to secure [state] appellate review of the denial of that claim." *Klein*, 667 F.2d at 282; *see also Pettaway v. Brown*, No. 09-CV-3587, 2010 WL 7800939, at *9 (S.D.N.Y. May 3, 2010) (same), *adopted by* 2011 WL 5104623 (S.D.N.Y. Oct. 26, 2011). In New York, "a criminal defendant must first appeal his or her conviction to the Appellate Division, and then must seek further review of that conviction by applying to the Court of Appeals for a certificate granting leave to

14

appeal." *Galdamez v. Keane*, 394 F.3d 68, 74 (2d Cir. 2005). If the petitioner fails to exhaust his or her state remedies through this entire appeal process, he or she may still fulfill the exhaustion requirement by collaterally attacking the conviction via available state methods. *See Klein*, 667 F.2d at 282–83; *West v. Sheahan*, No. 12-CV-8270, 2014 WL 5088101, at *3 (S.D.N.Y. Sept. 18, 2014); *Sparks v. Burge*, No. 06-CV-6965, 2012 WL 4479250, at *4 (S.D.N.Y. Sept. 28, 2012); *Torres v. McGrath*, 407 F. Supp. 2d 551, 557 (S.D.N.Y. 2006); *Rivera v. Conway*, 350 F. Supp. 2d 536, 544 (S.D.N.Y. 2004). For example, in New York a defendant may challenge the conviction based on matters not in the record that could not have been raised on direct appeal, *see* N.Y. Crim. Proc. Law § 440.10, but a defendant may not seek collateral review of claims that could have been raised on direct appeal and were not, *see id.* § 440.10(2)(c); *see also O'Kane v. Kirkpatrick*, No. 09-CV-5167, 2011 WL 3809945, at *7 (S.D.N.Y. Feb. 15, 2011) ("Under New York law, all claims that are record-based must be raised in a direct appeal. . . . It is only when a defendant's claim hinges upon facts outside the trial record, that he may collaterally attack his conviction by bringing a claim under CPL § 440.10."), *adopted by* 2011 WL 3918158 (S.D.N.Y. Aug. 25, 2011).

In addition, New York permits only one application for direct review. *See* N.Y. Comp. Codes R. & Regs. tit. 22, § 500.20(a)(2); *Jimenez v. Walker*, 458 F.3d 130, 149 (2d Cir. 2006) ("[The petitioner] has already taken his one direct appeal [under New York law] . . . ."). "New York procedural rules bar its state courts from hearing either claims that could have been raised on direct appeal but were not, or claims that were initially raised on appeal but were not presented to the Court of Appeals." *See Sparks*, 2012 WL 4479250, at *4. Accordingly, in those situations, a petitioner no longer has any available state court remedy, and the unexhausted claims are therefore deemed exhausted, but procedurally barred. *See Carvajal v. Artus*, 633 F.3d

95, 104 (2d Cir. 2011) ("If a habeas applicant fails to exhaust state remedies by failing to adequately present his federal claim to the state courts so that the state courts would deem the claim procedurally barred, we must deem the claim procedurally defaulted." (alteration and internal quotation marks omitted)); *see also Aparicio v. Artuz*, 269 F.3d 78, 90 (2d Cir. 2001) (noting the reality that deeming an unpresented claim to be exhausted is "cold comfort"). A dismissal of a habeas petition on such grounds is a "disposition . . . on the merits." *Id.* "An applicant seeking habeas relief may escape dismissal on the merits of a procedurally defaulted claim only by demonstrating 'cause for the default and prejudice' or by showing that he is 'actually innocent' of the crime for which he was convicted." *Carvajal*, 633 F.3d at 104 (quoting *Aparicio*, 269 F.3d at 90); *see also Dretke v. Haley*, 541 U.S. 386, 388 (2004) ("[A] federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default," or a showing that the petitioner "is actually innocent of the underlying offense . . . .").

### B. Application

Spanning multiple filings, Petitioner's Objections are disjointed, difficult to comprehend, and, for the most part, repeat the same arguments put forward in his Petition, without addressing, or referring to, Magistrate Judge Davison's recommendations. The Court construes Petitioner's principal objections to the R&R to be that (1) Magistrate Judge Davison failed to adequately consider his allegations of actual innocence, insofar as such a showing can overcome procedural bars that Magistrate Judge Davison found prevent review of some of Petitioner's claims, (*see, e.g.*, Pet'r's Obj IV at 1 ("I would also state [I am] pleading actual innocence due to the information provided in all my document[a]ry submission[s]."); Pet'r's Obj's I at 3 ("My document[a]ry evidence support[s] my claims of innocence."); *id.* at 4 (noting that the evidence

16

demonstrating his innocence is "before this Court[']s eye[]s" but apologizing for the fact that the

presentation of such evidence may have been confusing)), (2) Magistrate Judge Davison failed to

sufficiently address the fact that Petitioner purportedly filed a § 440.10 motion that covered the

claims brought in his Petition, (*see* Pet'r's Obj's II at 1 ("Petitioner objects to collateral attack of

submitting N.Y.S. [§] 440.10 Motion.")), and (3) Magistrate Judge Davison's determination that

Petitioner's false evidence claim was merely repetitive of his *Rosario* claim was erroneous, (*see*

Pet'r's Obj's I at 23).[10]  Beyond these, Petitioner's Objections consist of the same contentions

made to Magistrate Judge Davison or arguments related to new claims not raised in the Petition.

The Court will address those issues after review of the objections enumerated above.

      1. Actual Innocence

      Petitioner contends that he has a "colorable claim of factual innocence," (Pet'r's Obj's I

at 11–12), because the Order of Protection was a nullity, (*id.* at 8–11), and because of various

statements purportedly made by his wife claiming that the threats made at the police station

never occurred, (*see, e.g.*, Pet'r's Obj's III at unnumbered 6–7).  In "extraordinary case[s]," a

court may review a procedurally defaulted habeas claim in order to avoid a "fundamental

miscarriage of justice." *Schlup v. Delo*, 513 U.S. 298, 321 (1995) (internal quotation marks

omitted); *see also Doe v. Menefee*, 391 F.3d 147, 161 (2d Cir. 2004) (explaining that in

"extremely rare" cases, "a petitioner may use his claim of actual innocence as a 'gateway,' or a

means of excusing his procedural default, that enables him to obtain review of his constitutional

challenges to his conviction" (internal quotation marks omitted)).  However, this exception is

---

[10] The document containing Petitioner's first set of Objections contains inconsistent
pagination. (*See* Pet'r's Obj's I.) Citations to specific pages of this document refer to the page
numbers electronically printed in the upper right hand portion of each page of the docketed
version of the document.

expressly limited to situations where a petitioner presents a claim of actual innocence. *See Schlup*, 513 U.S. at 321 (noting that this exception is "explicitly tied" to the petitioner's innocence). "[A] claim of actual innocence must be both credible and compelling. For the claim to be credible, it must be supported by new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Rivas v. Fischer*, 687 F.3d 514, 541 (2d Cir. 2012) (internal quotation marks omitted). "For the claim to be compelling, the petitioner must demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt . . . ." *Id.* (internal quotation marks omitted).

First, with respect to the validity of the Order of Protection, Petitioner attached over a dozen exhibits to his Petition, which he argues, "[are] supportive of [his] claim" that the Order of Protection was a nullity. (Am. Pet. Part 2 at 17.) These documents consist mostly of state court documents connected to the criminal case that resulted in the Order of Protection and other criminal cases brought against Petitioner. (*See id.* at 8–10, 13–14, 17–20, Exs. 1–16.) Included are, among other things, jail booking forms, (Am. Pet. Part 2 Exs. 3, 5, 13), domestic violence information forms, (Am. Pet. Part 2 Exs. 11, 12), a violation of probation order, (Am. Pet. Part 2 Ex. 8-A), and a portion of Petitioner's criminal history, (Am. Pet. Part 2 Ex. 9).[11]  Petitioner contends that these documents conclusively establish that the Order of Protection was a legal nullity at the time of his arrest because (1) the actual judge presiding over his case did not sign the Order of Protection, (*see, e.g.*, Am. Pet. Part 2 at 12, 14), and (2) the Order of Protection was no longer in force because the criminal proceeding that gave rise to the Order of Protection was

---

[11] The domestic violence information forms contain statements from Ms. Read that Petitioner "put his hand on the back of [Ms. Read's] head and slammed [her] forehead against the steering wheel . . . ." (Am. Pet. Part 2 Ex. 12.)

no longer active, (*see, e.g.*, *id.* at 7, 12, 15). Because the violation of an order of protection is a necessary element of criminal contempt in the first degree, absent circumstances not applicable here, (*see* N.Y. Penal Law § 215.51), Petitioner argues that the invalidity of the Order of Protection means he is actually innocent of the crime for which he was convicted, (*see* Pet'r's Obj's I at 8, 11–12).

First, the Court questions whether the documents provided by Petitioner qualify as the type of "new evidence" required to make Petitioner's claim "credible" under *Rivas*, given that there is no reason that the documents—mostly state court documents—would have been unavailable to Petitioner at trial. *See Tuitt v. Martuscello*, No. 12-CV-1003, 2013 WL 5508385, at *15 n.16 (S.D.N.Y. Oct. 3, 2013) (noting that "the definition of 'new' evidence remains an open question in th[e] [Second] Circuit" and that other circuits have "split over whether the new evidence must have been 'unavailable' at the time of trial, or simply 'not produced' at that time"); *see also Bowman v. Racette*, No. 12-CV-4153, 2015 WL 1780159, at *3 (S.D.N.Y. Apr. 20, 2015) ("[T]he definition of 'new' evidence under the *Schlup* standard appears to be an open question in this Circuit."). Nevertheless, even considering these exhibits as "new evidence," Petitioner's actual innocence claim is far from "compelling." The Court has reviewed Petitioner's documentary evidence but finds no support for his assertion that the evidence clearly demonstrates that the "the issuing judge was in fact [Judge] Ugell, not [Judge] Alfieri[,] mak[ing] [the] [O]rder of [P]rotection not valid," (Am. Pet. Part 2 at 15), because Judge Alfieri, whose signature appears on the Order of Protection, did not actually sign the order due to his having been recently elected to the Supreme Court of Rockland County, (*see, e.g.*, *id.*). The evidence provided does not effectively rebut the clear testimony provided at trial by Candyce Draper, the Chief Court Clerk of the Town of Clarkstown. Draper testified that she was present

in court on August 30, 2006, when Judge Alfieri issued the Order of Protection. (*See* Aug. 12, 2010 Trial Tr. 36, 41.) She further testified that she recognized the Order of Protection as "[a]n order of protection issued against [Petitioner,] signed by Judge Victor Alfieri." (*Id.* at 36.) She also testified that she remembered seeing Petitioner in court on August 30, 2006, and she identified him in court during her testimony. (*Id.* at 41.)[12] Thus, Petitioner's first challenge to the validity of the Order of Protection fails.

Petitioner's other argument attacking the validity of the Order of Protection likewise fails. Petitioner appears to argue that the Order of Protection became a nullity when Petitioner was re-sentenced on the conviction resulting in the Order of Protection after pleading guilty to a separate charge. (*See* Am. Pet. Part 2 at 9, 13–14.) According to Petitioner, because he "was aquited [sic] or[] sent[e]nced, [and the] criminal action is no longer pending, any temporary order of protection issued by [the] court, under [the] statute providing for issuance of such order when any criminal act is pending[,] becomes a mere nullity." (*Id.* at 15; *see also* Pet'r's Obj's 1 at 9–10.) Petitioner cites to New York case law to support his argument. (*See, e.g.,* Am. Pet. Part 2 at 21–25; Pet'r's Obj's 1 at 8–9.) But these cases, and Petitioner's argument, rely on N.Y. Crim. Proc. Law §530.13(1), which allows for the issuance of a *temporary* order of protection

---

[12] With respect to Petitioner's persistent focus on the fact that Judge Alfieri was elected to the Rockland County Supreme Court in 2006, (*see* Am. Pet. Part 2 at 12 ("[Judge Alfieri] was elected to the [S]upreme [C]ourt of the County of Rockland. Took the bench before th[e] [O]rder of [P]rotection was issued on 8/30/2006."); *see also, e.g., id.* at 10, 11, 13, 14, 15), the Court notes that the Order of Protection was ordered on August 30, 2006 but Rockland County appeared to hold its election for County Court in November of that year, after the Order of Protection was signed. *See* Sarah Netter, *Prosecutor, Public Defender to Fill County Bench Vacancies*, The Journal News (Westchester County, N.Y.), June 21, 2006, at 12A ("[C]andidates [for the Rockland County Court] Charles Apotheker, Victor Alfieri Jr., William Warren[,] and Tom Walsh will face off in a *September* primary. Two will advance to *November's* general election." (emphases added)). Thus, Petitioner's claim that Judge Alfieri's election meant that he could not have signed the Order of Protection is belied by the facts.

"as a condition of a pre-trial release, or as a condition of release on bail or an adjournment in contemplation of dismissal."[13]  For example, in *People v. Bleau*, 718 N.Y.S.2d 453 (App. Div. 2001), the Third Department held that "the critical factor in issuing a *temporary* order of protection under CPL 530.13(1) is [the] defendant's status as a charged offender and the pendency to the action," and, thus, "[o]nce a defendant is acquitted or sentenced . . . the criminal action is no longer pending and, therefore, the temporary order of protection becomes a nullity." *Id.* at 454 (citation omitted).

Here, it is apparent on the face of the Order of Protection that it was not a *temporary* order of protection issued under N.Y. Crim. Proc. Law § 530.13(1) or § 530.12(1).  The Order contained two boxes: one for a "temporary order of protection," which itself contained further boxes allowing the judge to indicate whether the order was issued as a condition of recognizance, release on bail, or adjournment in contemplation of dismissal, and a second box for an "order of protection" issued because "defendant has been convicted" of a crime.  (*See* Answer Ex. 1.) Because the Order of Protection was issued after Petitioner was convicted of a crime, and not at the outset of criminal proceedings, the "order of protection" box is checked.  (*Id.*)  Accordingly, the August 30, 2006 Order of Protection was not dependent on the pendency of any action, but rather was to be in effect until the date specified in the order, August 29, 2009.  The Court cannot, therefore, conclude that, based on Petitioner's exhibits, "more likely than not . . . no reasonable juror would find [Petitioner] guilty beyond a reasonable doubt" and thus Petitioner

---

[13] In 2007, the New York legislature amended the statute to expand the court's ability to issue a temporary order of protection "in conjunction with any securing order committing the defendant to the custody of the sheriff."  2007 N.Y. Sess. Laws Ch. 137 A. 8193 (McKinney).

N.Y. Crim. Proc. Law § 530.12(1) covers domestic violence crimes committed against family members, including spouses, and contains substantially similar language to § 530.13(1) regarding temporary orders of protection.

has not demonstrated "actual innocence" based on the validity of the Order of Protection that would merit consideration of Petitioner's procedurally barred habeas claims. *Rivas*, 687 F.3d at 541 (internal quotation marks omitted).

Petitioner also seeks to "use . . . information" from his wife to establish the "actu[]al innocence exception." (Pet'r's Obj's III at unnumbered 6 (emphasis omitted); *see also* Pet'r's Obj's IV at 1 ("[T]he truth of the matter is the [victim] is going to testify in person as to evidence proving my innocence." (second alteration in original)).) Petitioner has submitted two documents purportedly from Ms. Read in support of his claim of actual innocence. The first, attached to his Petition, is a document professing to be a "sworn aff[i]rmation," which states, in pertinent part: "Also[,] there was a[n] all[e]gation that David Read while at [the] police station stated he was [f]ucking going to kill me. This never happen[e]d at the police station[] [b]ecause [I] was not there on 4/27/2009." (*See* Witness Statement 2.) The affirmation contains Ms. Read's signature, but is undated and not notarized. (*Id.* at 6.) After the R&R was issued, Petitioner submitted a typed letter from Ms. Read which states that on April 27, 2009 Petitioner did not "tell [her] that he was going to kill [her] . . . in the Suffern Police Station." (Dkt. No. 62.)

The statements provided by Ms. Read do not amount to "new *reliable* evidence" necessary to make out a credible claim of actual innocence. *Rivas*, 687 F.3d at 541 (emphasis added) (internal quotation marks omitted). "In assessing reliability, the reviewing court should 'evaluate the testimony in light of the substance of other evidence, considering the potential motives to be untruthful that the witness may possess, corroboration or the lack thereof, internal consistency, and the inferences or assumptions that crediting particular testimony would require.'" *Hayward v. Brown*, No. 09-CV-6495, 2010 WL 2629037, at *16 (S.D.N.Y. July 1, 2010) (report and recommendation) (internal quotation marks omitted) (quoting *Menefee*, 391

F.3d at 164–65). As Petitioner's wife, Ms. Read's credibility fairly can be questioned. *See Garcia v. Portuondo*, 334 F. Supp. 2d 446, 455–56 (S.D.N.Y. 2004) (considering credibility of affidavit provided by the petitioner's wife and noting that "[o]bviously, [the wife] ha[s] reason to lie to protect [the] petitioner"); *see also Philbert v. Brown*, No. 11-CV-1805, 2012 WL 4849011, at *7 (E.D.N.Y. Oct. 11, 2012) (noting that "a reasonable juror would likely question the credibility of the affidavits, as they were provided by [the petitioner's] girlfriend and his girlfriend's mother"); *Lawrence v. Greene*, No. 06-CV-202, 2011 WL 1327128, at *7 (E.D.N.Y. Mar. 31, 2011) ("[Because the affidavits] were provided by [the] [p]etitioner's sister [and] girlfriend . . . the court cannot conclude that the alibi affidavits are trustworthy."); *Desrosiers v. Phillips*, No. 05-CV-2941, 2006 WL 2092481, at *8 (E.D.N.Y. July 27, 2006) (report and recommendation) ("Generally, . . . exculpatory affidavits [from friends] do not establish actual innocence, as they are not reliable."); *McCray*, 2005 WL 3182051, at *4 (discrediting affidavit of the petitioner's "good friend" where, among other things, the affiant "waited until after [the] [p]etitioner's conviction to come forward with his testimony"). Indeed, Ms. Read's own affidavit underscores her motivation to have Petitioner released from prison: "I love [D]avid Read and want to have babies with my husband. . . . I am the only witness that could help David Read." (Witness Statement 4.) And as Petitioner points out, Ms. Read "comes to see [him in prison], puts money on the phone, writes letters, [and] sends food," (Pet'r's Obj's 1 at 4), further reinforcing that Ms. Read has a substantial interest in securing Petitioner's release from prison. Additionally, credibility concerns are particularly acute in situations involving domestic violence. As the Second Circuit has recognized, "[v]ictims of [domestic] violence often are protective of, and deny allegations against, their abusers." *United States v. Carthen*, 681 F.3d 94, 103 (2d Cir. 2012); *see also Jimenez v. City of N.Y.*, No. 14-CV-2994, 2015 WL 5638041, at

*6 (S.D.N.Y. Sept. 24, 2015) ("[T]he Second Circuit has admonished judges to view recantations from victims of domestic violence with the utmost suspicion." (internal quotation marks omitted)); *accord West v. West*, 694 F.3d 904, 906 (7th Cir. 2012) ("[R]ecantations by abused spouses often turn out to be untruthful because of the victim's fear of retaliation, financial dependence, or hope of saving the marriage.").

Even if Ms. Read's statements are deemed "credible," Petitioner has not made out a "compelling" claim of actual innocence. Accepting Ms. Read's statements as true would require the jury to discredit the testimony of Officer Giannettino, Sergeant Gloede, and 911 dispatcher Mueller. (*See* Resp't's Mem. 6.) "It cannot be said that it is more likely than not that the jury would have believed the statements of [Petitioner's wife] over that of the police officers" and 911 dispatcher. *Hayward*, 2010 WL 2629037, at *16. Accordingly, Petitioner has not established that it is "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt . . . ." *Rivas*, 687 F.3d at 541 (internal quotation marks omitted).[14]

---

[14] Insofar as Petitioner advances a freestanding actual innocence claim as a ground for habeas relief, the Court notes that the Supreme Court "has never expressly held that a petitioner may qualify for habeas relief based solely on a showing of actual innocence." *Rivas*, 687 F.3d at 540 & n.34; *see also McQuiggin v. Perkins*, 133 S. Ct. 1924, 1931 (2013) ("We have not resolved whether a prisoner may be entitled to habeas relief based on a freestanding claim of actual innocence.") However, if a freestanding actual innocence claim could warrant habeas relief, Petitioner has failed to make such a showing because the threshold for "any hypothetical freestanding innocence claim [i]s 'extraordinarily high'" and such a showing requires "more convincing proof of innocence" than the showing of innocence necessary to satisfy *Schlup*. *House v. Bell*, 547 U.S. 518, 555 (2006) (quoting *Herrera v. Collins*, 506 U.S. 390, 417 (1993)). Because Petitioner fails to satisfy the *Schlup* standard, he cannot satisfy the more stringent requirements for any freestanding innocence claim.

### 2.  Purported § 440.10 Motion

In his Objections, Petitioner contends that he filed a motion under N.Y. Crim. Proc. Law § 440.10 that covered all the claims in his Petition.  (Pet'r's Obj's II at 4.)  The Court notes that Petitioner was unable to provide a copy of the actual brief and none of the supporting documentation approaches establishing that he submitted such a motion, let alone that the brief contained arguments addressing all of the Petition's claims.  Thus, the Court will not allow Petitioner's mythical motion to cure any existing exhaustion deficiencies.  *See Martin v. Jones*, No. 87-CV-3252, 1989 WL 94342, at *1–2 (S.D.N.Y. Aug. 4, 1989) (rejecting the petitioner's assertion that the district court should consider all of the petition's claims regardless of whether they were exhausted in state court where the petitioner's appellate briefs were lost and their contents were thus unknown).  However, even assuming that Petitioner did send the Rockland County Court a § 440.10 motion that covered all the claims included in his Petition and the motion was indeed the motion referred to in the October 25, 2010 Letter from the Rockland County judge's law secretary, the motion would do nothing to cure any exhaustion issues faced by Petitioner because any claims raised in that motion would not be exhausted until there was a decision on the § 440.10 motion and Petitioner sought leave to appeal a denial of the motion to the Appellate Division, neither of which occurred.  *See, e.g., Collazo v. Lee*, No. 11-CV-1804, 2011 WL 6026301, at *2 (E.D.N.Y. Dec. 2, 2011) ("[The] petitioner was required to seek leave to appeal the denial of his C.P.L. § 440.10 motion in order to fairly present the claim to the appropriate state court and exhaust state court remedies.")*; Escalera v. Taylor*, No. 06-CV-13635, 2010 WL 307868, at *4 (S.D.N.Y. Jan. 25, 2010) (finding there was "no question" that petitioner's claims were unexhausted where the petitioner "challenged his re-sentencing in his

§ 440 motion, . . . [but] failed to seek leave to appeal the denial of that motion to the Appellate Division.").

Further, Petitioner cannot use the October 25, 2010 Letter returning his purported § 440.10 motion to demonstrate "cause" for any of his procedural defaults. To demonstrate cause for a procedural default Petitioner must "show that some objective factor external to the defense impeded [his] efforts to comply with [New York's] procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *see also Flores v. Rivera*, No. 06-CV-13517, 2009 WL 1110578, at *4 (S.D.N.Y. Apr. 23, 2009) (same). While cause can be demonstrated with a showing of "some interference by officials," such interference has to have "made compliance *impracticable*." *Id.* (emphasis added) (internal quotation marks omitted). The October 25, 2010 Letter returning Petitioner's purported motion did not make his compliance with § 440.10 impracticable. Rather, the Letter identified the deficiencies in Petitioner's filing, which, if anything, made it *easier* for Petitioner to re-file the motion at the appropriate time and thus ensure state review of his constitutional claims. At bottom, Petitioner's failure to follow through with his purported motion was a result of his own "[i]gnorance or inadvertence" which "will not constitute 'cause.'" *Washington v. James*, 996 F.2d 1442, 1447 (2d Cir. 1993).

Accordingly, the Court rejects any objection by Petitioner based on his assertion that he filed a § 440.10 motion presenting all the claims in his Petition.

### 3. False or Changed Testimony

Petitioner repeatedly claims that his conviction was based on false or perjured testimony. (*See, e.g.*, Am. Pet. ¶ 12 (Ground One); Am. Pet. Part 1 at 4–7, 14–38.) Magistrate Judge Davison concluded that the claim "amounts to a reprisal of [P]etitioner's *Rosario* claim" and recommended that the claim be denied for the same reasons the *Rosario* claim should be

denied—the claim was unexhausted but could be deemed exhausted and procedurally defaulted. (R&R 22–23; *see id.* at 20–21.)  Petitioner objects to Magistrate Judge Davison's "statement regarding [the] repacking [of] the Rosario claim," noting that it "was not [Petitioner's] intention[]" to do so.  (Pet'r's Obj's I at 23.)  He further argues that "[m]anufacturing evidence and it[]s knowing use at trial violates the due process clause" and that "[t]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberat[e]ly fabricated by the gover[n]ment."  (*Id.* at 24, 27.)

The Court agrees with Petitioner that a liberal reading of his Petition requires the Court to conclude that Petitioner sought to make a separate, freestanding claim that his conviction was based on false evidence.  The Petition expressly states Petitioner's belief that "Petitioner was wrongfully convicted upon . . . false testimony" and that "perjured testimony" was used to convict him.  (Am. Pet. ¶ 12 (Ground One).)  While the Petition and its supporting papers are replete with references to "changed" testimony and Petitioner does invoke the trial judge's statement highlighting inconsistencies between grand jury testimony and pre-trial *Dunaway*/*Huntley* hearing testimony, Petitioner does not rely solely on "what he suspects would be revealed by production of the grand jury transcript," as Magistrate Judge Davison concluded. (R&R 22–23 (emphasis omitted).)[15]  Instead, Petitioner attaches a number of exhibits to his Petition that he argues demonstrate that the testimony given about the incident at the Suffern Police Department was false.  (*See* Am. Pet. Part 1 at 22–31; *see also* Pet'r's Obj's I at 25 ("Read carefully [the] arrest report [and] nar[ra]tive report . . . .").)  For example, many exhibits are documents containing different officers' narrative descriptions of the circumstances surrounding

---

[15] Indeed, Petitioner concedes that Officer Giannettino testified to the grand jury about the police station incident.  (*See* Am. Pet. Part 1 at 33.)

Petitioner's arrest and his time in prison immediately thereafter. (*See* Am. Pet. Part 1 Exs. 4, 6–10, 12–17 (Dkt. No. 13-4).) The Court construes the core of Petitioner's argument to be that the officers' testimony at trial regarding the incident at the police station must be false because various officers' descriptions of Petitioner's arrest do not refer to any incident at the police station. (*See, e.g.*, Am. Pet. Part 1 at 31 (noting that the officers' reports do not "testify to any event at police station other than [an unrelated incident]").) Additionally, the Petition contains a copy of Ms. Read's purported affirmation which directly conflicts with the officers' testimony regarding the police station incident and thus is further evidence Petitioner has provided in support of his false evidence claim. (Witness Statement 2; *see also* Pet'r's Obj's I at 24 (noting that Ms. Read's "supporting aff[i]rmation is evidence" of the fact that she was never at the police station and thus that manufactured evidence was used to convict Petitioner).)

Having determined that Petitioner does seek habeas relief on the grounds that his conviction was based on false evidence, the Court next addresses the exhaustion issue. Petitioner did not raise this claim in any state court and thus it is unexhausted.[16] However, because the claim relies at least somewhat on evidence outside of the record—particularly Ms. Read's statements—the claim arguably could have been raised in a collateral motion pursuant to N.Y. Crim. Proc. Law § 440.10.[17] Thus, Petitioner may still have a remedy available in state court,

---

[16] As noted by Magistrate Judge Davison, Petitioner's appellate brief did allude to the trial judge's comments concerning the differences between the testimony of prosecution witnesses before the grand jury and at the pre-trial hearings, but the reference was made only in connection with the *Rosario* claim, not an assertion that Petitioner's conviction was based on false evidence. (R&R 23 n.18.) Petitioner also used the term "false evidence" in the supplemental brief described in note 5, *supra*. But, as discussed above, there is no indication the brief was ever filed, and, in any event, no false evidence claim was ever presented to the New York Court of Appeals.

[17] The Court notes that it is not clear whether the various arrest reports and other officer narratives were part of the record in the state court trial.

and the claim cannot be deemed exhausted. *See Brown v. New York*, No. 08-CV-582, 2010 WL 1260205, at *5 (E.D.N.Y. Mar. 31, 2010) ("Since [the petitioner's] claims that the prosecution and the police presented false and manufactured evidence are based upon matters outside the record of the state court proceeding, he can likely raise such claims in a collateral proceeding under . . . § 440.10."). However, the claim can still be dismissed under 28 U.S.C. § 2254(b)(2) because it is plainly meritless. *See Rhines v. Weber*, 544 U.S. 269, 277–78 (2005) (a district court should not grant a stay allowing a petitioner to present his unexhausted claims to a state court where the unexhausted claims are "plainly meritless").

"The Supreme Court has recognized that the use of a witness's false testimony can violate a defendant's due process rights." *Cotto v. Fischer*, No. 09-CV-9813, 2012 WL 5500575, at *29 (S.D.N.Y. Aug. 23, 2012) (citing *Napue v. Illinois*, 360 U.S. 264, 267–69 (1959)), *adopted by* 2012 WL 5499890 (S.D.N.Y. Nov. 12, 2012). "The threshold question is whether the evidence presented was false. With respect to perjured testimony, this requires a showing that the witness gave false testimony concerning a material [matter] with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory." *Black v. Rock*, 103 F. Supp. 3d 305, 317 (E.D.N.Y. 2015) (citation and internal quotation marks omitted). "The petitioner has the burden of demonstrating, by a preponderance of the evidence, that the witness committed perjury." *Id.* (internal quotation marks omitted).[18] Petitioner has failed to satisfy his burden of demonstrating

---

[18] Petitioner must also demonstrate that the false testimony was or should have been known to the prosecution to be false, the testimony went uncorrected, and the false testimony was prejudicial. *See Shih Wei Su v. Filion*, 335 F.3d 119, 127 (2d Cir. 2003). Because Petitioner has not demonstrated that the officers' testimony was perjurious, the Court need not reach these issues. The Court notes, however, that Petitioner does not provide any actual evidence that the prosecution knew, or should have known, that the officers' testimony was false.

that the officers committed perjury.  As discussed above, Petitioner relies on arrest reports and

other similar documents that contain various officers' narrative descriptions of the events

surrounding Petitioner's arrest.  First, a number of these documents contain narrative

descriptions from officers that appear to have had no role in the underlying arrest of Read and

thus the absence of any description of the incident at the police station has no bearing on whether

or not it actually occurred.  (*See, e.g.*, Am. Pet. Part 1 Exs. 15–17 (Dkt. No. 13-4).)[19]  Regardless,

even the reports provided by the officers that testified at trial about the police station incident,

such as Officer Giannettino and Sergeant Gloede, do not directly conflict with their testimony.

For example, Petitioner submitted a report from Gloede (which appears to have been created in

response to Petitioner's separate excessive force complaint) that stated, in pertinent part, as

follows:

> Domestic involved a complainant named Michelole [sic] Surdak against her husband
> David Read, where she said he violated a valid Order of Protection by harassing her.
>
> On my arrival I observed Surdak and Read inside a studio apartment and officers from
> the Suffern Police Department were already on scene.
>
> Surdak was stating [that] she wanted Read arrested as he violated an OOP by stating he
> was going to harm her.  During this[,] Read was yelling at Surdack [sic] in a threatening
> manner.
>
> Surdak was asked by me if she would supply a statement for the Domestic Incident
> Report, and she stated she would.  I advised the officers to place Read in custody.
>
> Read became even more irate at Surdak and did state in witness [sic] that he would kill
> her for this.
>
> Read was brought to this station and processed according to department rules and
> regulations.
>
> Surdak responded and gave a written statement for the case.

---

[19] Indeed, some documents appear to address only events underlying a civil suit for
excessive force brought by Petitioner for an incident that occurred the day following his arrest.
(*See, e.g.*, Am. Pet. Part 1 at 30.)

> While in custody Read stated he wanted to commit suicide and was transported to Good
> Samaritan Hospital Emergency room where Off[icer] Giannettino and I stood by with
> Read outside of Room #9. Read was in good spirits and alert and was not combative.

(Am. Pet. Part 1 Ex. 10, at 1 (Dkt. No. 13-4).) The Court construes Petitioner's argument to be

that testimony related to the incident at the police station must be false because Gloede's

narrative (among others) does not include the outburst at the police station. But the absence of

such a reference does not mean that the incident at the police station was fabricated. The

narratives do not, for example, state that Petitioner was calm and quiet in his holding cell at the

station or that Ms. Read never visited the police station. To the extent that the narratives do not

allude to the police station incident, the narratives can, *at most*, be deemed somewhat

*inconsistent* with the officers' testimony. But such inconsistencies are insufficient to establish

that the officers committed perjury. *See, e.g.*, *Cotto*, 2012 WL 5500575, at *29 ("Simple

inaccuracies or inconsistencies in testimony do not . . . rise to the level of perjury." (internal

quotation marks omitted) (quoting *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir.

2001))); *Pucci v. Smith*, No. 08-CV-6092, 2010 WL 2869480, at *10 (W.D.N.Y. July 20, 2010)

("The mere existence of inconsistencies in witness testimony is insufficient to establish that

perjury was committed."); *Bonilla v. Giambruno*, No. 04-CV-188, 2009 WL 2762266, at *12

(W.D.N.Y. Aug. 26, 2009) (rejecting argument that police officer's testimony regarding

statement made by the petitioner after his arrest constituted perjury merely "because the arrest

report does not refer to such a statement," and noting that "[a]n inconsistency between the arrest

report and [the officer's] testimony at trial does not render [the officer's] testimony perjurious");

*Dinsio v. Donnelly*, No. 03-CV-779, 2007 WL 4029221, at *7 (N.D.N.Y. Nov. 15, 2007)

(denying the petitioner's habeas claim based on perjured testimony argument because the

petitioner "simply pointed out [inconsistencies] in the testimony of certain witnesses and

described alleged discrepancies between the testimony and the dispatch records" which was insufficient to establish perjury as a matter of law).[20]

Petitioner also relies on Ms. Read's affirmation as further evidence that the officers' trial testimony was false. It is true that Ms. Read claims that she was never at the Suffern Police Department on April 27, 2009, which directly conflicts with the officers' trial testimony indicating that Petitioner threatened Ms. Read at the police station that night. (*Compare* Witness Statement 2, *with* Aug. 12, 2010 Trial Tr. 66–67, 84, 164, *and* Aug. 13, 2010 Trial Tr. 19.) However, the Second Circuit has stated that "[e]ven a direct conflict in testimony does not in itself constitute perjury." *United States v. Gambino*, 59 F.3d 353, 365 (2d Cir. 1995); *see also Florez v. United States*, No. 07-CV-4965, 2009 WL 2228121, at *10 (E.D.N.Y. July 24, 2009) ("Contradictory testimony or differences in recollection among witnesses does not alone amount to perjury.") Furthermore, as discussed above, there are serious reasons to question the credibility of the purported affirmation and letter from Ms. Read.

Finally, although Petitioner repeatedly refers to the trial judge's statement about the "disturbing" nature of the case and the "substantial differences" in testimony as evidence that the police station incident testimony is fabricated, (*see, e.g.*, Am. Pet. Part 1 at 5; Pet'r's Obj's I at 22–23), it bears noting that the differences in testimony that concerned the trial judge were

---

[20] The Court notes that Petitioner also relies on testimony from: (1) a preliminary hearing in the aftermath of the arrest, (2) the grand jury, and (3) a pre-trial *Dunaway/Huntley* hearing. (*See* Am. Pet. Part 1 at 32–36; *id.* at Exs. 19–23 (Dkt. Nos. 13-5–13-7).) The Court has reviewed the testimony, and as with the exhibits discussed above, there is no testimony that actually conflicts with the officers' trial testimony about the police station incident. Indeed, Petitioner merely takes issue with the fact that the testimony at the initial pre-trial hearings does not reference the police station incident. (*See, e.g.*, Am. Pet. Part 1 at 32 ("[Giannettino] never once stated anything related to the police station . . . .").)

The Court points out that Petitioner typed some of the transcripts that he attached to his Petition. (*See, e.g., id.* at Ex. 20 (Dkt. No. 13-5).) The Court assumes the accuracy of these transcripts for purposes of its review.

differences between the grand jury testimony and the testimony at the *Dunaway/Huntley* hearing, (*see* Oct. 28, 2009 Hr'g Tr. 2–3 (noting that the court had "reviewed the grand jury minutes" and "compared them with the testimony of the officers before the court")).  But, as Petitioner concedes, (*see* Am. Pet. Part 1 at 33; Pet'r's Obj's 1 at 25), Officer Giannettino's grand jury testimony included the allegedly fabricated police station incident, (*see* Am. Pet. Part 1 Ex. 21, at 8–9 (Dkt. No. 13-5)).  Thus, the trial judge could not have been expressing concern over the fact that witnesses at the *Dunaway/Huntley* hearing testified for the first time regarding an incident at the police station.[21]

Ultimately, Petitioner's failure to demonstrate that the officers' trial testimony related to the police station incident amounted to perjury renders his unexhausted false evidence claim plainly meritless and this Court thus denies the claim on substantive grounds.[22]

---

[21] Petitioner also objects to Magistrate Judge Davison's "mis[]interpretation" of the trial court's decision to suppress Petitioner's statements made in the presence of law enforcement. (*See* Pet'r's Obj's 1 at 22.)  Specifically, Petitioner challenges Magistrate Judge Davison's conclusion that, despite voicing concerns about alleged inconsistences in the testimony, the trial court "did not change its ruling with regard to the validity of the [I]ndictment." (R&R 3.) According to Petitioner, this conclusion is wrong because the trial court granted Petitioner's motion to suppress his statements to law enforcement. (Pet'r's Obj's 1 at 21–22.)  The order suppressing Petitioner's statements, however, was not an order regarding the validity of the Indictment.  Also, the Appellate Division reversed the trial court's decision, and, in any event, the trial court's finding underlying its suppression decision—that probable cause did not exist for arresting Petitioner—has absolutely no bearing on whether the incident at the police station actually occurred and thus whether the officers' testimony was perjurious.

[22] Petitioner also repeatedly stresses that he was "convicted on a charge that [he] was not charged with" because "[b]oth count[s] to [the] [I]ndictment [we]re at [his] residence." (Am. Pet. Part. 1 at 20; *see also id.* at 3–4, 11–12, 15–16, 21–22, 33–35; Pet'r's Obj's 1 at 24–25.)  The Court recognizes that the initial felony information and case reports provided by Petitioner refer only to violations of N.Y. Penal Law § 215.51 at 35 Park Ave., (*see, e.g.*, Am. Pet. Part 1 Exs. 3, 6 (Dkt. No. 13-4)), and that the various case and arrest reports provided generally refer to two first degree criminal contempt charges, one for harassment over the telephone (N.Y. Penal Law § 215.51(b)(iv)) and one for harassment in person (N.Y. Penal Law § 215.51(b)(v)), and the narrative descriptions of the events underlying those arrests indicate that the latter charge corresponds to Petitioner's actions at 35 Park Ave. and not the police station, (*see* Am. Pet. Part 1 Exs. 6, 7, 8 (Dkt. No. 13-4)).  However, this is *not* evidence that the incident at the police

### 4. *Rosario* Claim

Petitioner challenges his conviction on the grounds that the prosecution "failed to turn over [g]rand [j]ury minut[e]s as Rosario material to the defendant, a per se reversible error." (Am. Pet. Part 1 at 8; *see also id.* at 9–11; Appellant's Br. 28–32.) Magistrate Judge Davison recommended that Petitioner's *Rosario* claim be denied because the claim is unexhausted, but can be deemed exhausted and procedurally defaulted because it is now procedurally barred under state law. (*See* R&R 20–21.) Petitioner did not specifically object to this conclusion, which this Court has reviewed for clear error, and has found none, clear or otherwise.[23] Accordingly, Petitioner's *Rosario* claim is denied.[24]

### 5. Missing Witness Charge

Petitioner claims that the trial court erred in denying his request for a missing witness instruction as to Ms. Read. (Am. Pet. ¶ 12 (Ground Three); *see also* Am. Pet. Part 3.) Magistrate Judge Davison concluded that the challenge "does not raise any federal constitutional

---

station did not occur and that testimony about the incident was false. And to the extent Petitioner asserts he was convicted on charges not present in the Indictment, the Court notes that the Indictment charged Petitioner with two identical counts of first degree criminal contempt and alleged only that he had committed the crimes "in the County of Rockland," without specifying an address. (Answer Ex. G.) Further, before trial, the prosecution filed a Bill of Particulars, which specified that Petitioner committed the first count of criminal contempt at 35 Park Ave. and the second count at the police station. (Answer Ex. H, at 1.)

[23] Although Petitioner noted in one of his filings that he "will object to the Rosario claims being defaulted," (Pet'r's Obj's III at unnumbered 5), his subsequent filing did not address the claim, (*see* Pet'r's Obj's IV).

[24] Additionally, if the Court were to reach the merits of the claim, it would still be denied because Petitioner's *Rosario* claim is not cognizable on federal habeas review. *See, e.g.*, *Ragland v. Graham*, No. 09-CV-9639, 2015 WL 545541, at *5 (S.D.N.Y. Feb. 10, 2015) (noting that a *Rosario* claim "does not present a federal constitutional question as *Rosario* is based wholly on New York law" and thus "is not subject to review under a writ of habeas corpus"); *Green v. Artuz*, 990 F. Supp. 267, 274 (S.D.N.Y. 1998) ("[F]ailure to turn over *Rosario* material is not a basis for habeas relief as the *Rosario* rule is purely one of . . . state law.").

issue which is cognizable on habeas review." (*See* R&R 26.) Petitioner's Objections do not

directly address Magistrate Judge Davison's conclusion. (*See* Pet'r's Obj's I at 15–20.) Instead,

Petitioner contends that the trial judge "should of [sic] granted [Petitioner's] lawyer the charge

missing witness," and notes that if Petitioner was "allowed the missing witness charge" the trial

"would of [sic] greatly been different." (*Id.* at 16, 20.) Having provided no specific objections

to Magistrate Judge Davison's determination, the Court reviews the recommendation for clear

error and finds that "the factual and legal bases supporting" the conclusion "are not clearly

erroneous or contrary to law." *Adams*, 855 F. Supp. 2d at 206.[25]

The Court notes that Petitioner's purported Objections addressing the missing witness

charge claim contain a new list of constitutional rights of which Petitioner was apparently

deprived at some point during his prosecution. (*See generally* Pet'r's Obj's I at 15–20.) For

example, Petitioner states that he wanted to testify in his defense, that his lawyer was aware of

that fact, and yet "nobody called [him] to the [] stand," resulting in ineffective assistance of

counsel. (*Id.* at 15, 17.) Petitioner also hints at a claim that he was denied the right to

compulsory process under the Sixth Amendment, and Petitioner also argues that if he was merely

provided "any hidden right" that this Court "deems fit," then his trial would have "greatly been

different." (*Id.* at 18–20.) To the extent Petitioner seeks habeas relief on these claims,

Petitioner's failure to raise them in his Petition (let alone on appeal in state court) precludes their

---

[25] Petitioner's general statement that he "would like to object to the missing witness count," (Pet'r's Obj's I at 15), does not qualify as a specific objection requiring the Court to engage in de novo review, *see Chiari v. N.Y. Racing Ass'n*, 972 F. Supp. 2d 346, 351 (E.D.N.Y. 2013) ("Although the objections to a report and recommendation of a pro se party should be accorded leniency, even a pro se party's objections . . . must be specific and clearly aimed at particular findings in the magistrate's proposal . . . ." (first alteration in original) (italics and internal quotation marks omitted)). In any event, even a de novo review would yield the same conclusion.

consideration. *See, e.g., Davis v. Herbert*, No. 00-CV-6691, 2008 WL 495316, at *1 (S.D.N.Y.

Feb. 25, 2008) ("[U]pon review of a habeas petitioner's objections to a magistrate judge's report

and recommendation, the Court may not consider claims raised for the first time in the

petitioner's objections . . . ."); *Gonzalez v. Garvin*, No. 99-CV-11062, 2002 WL 655164, at *1

(S.D.N.Y. Apr. 22, 2002) (rejecting objection containing ineffective assistance of counsel claim

"because it was not raised in [petitioner's] original petition"); *McPherson v. Johnson*, No. 95-

CV-9449, 1996 WL 706899, at *2 (S.D.N.Y. Dec. 9, 1996) ("[The] [p]etitioner cannot raise, in

his objection to the [m]agistrate [j]udge's [r]eport, new claims not raised in his initial petition.").

### 6.  Invalid Order of Protection

As discussed above, Petitioner contends that the Order of Protection he was convicted of

violating was a nullity. (Am. Pet. ¶ 12 (Ground Two).)  Magistrate Judge Davison concluded

that the claim must be denied because it is unexhausted but can be deemed exhausted and

procedurally defaulted because it is now procedurally barred under state law. (*See* R&R 23–25.)

Petitioner's Objections generally reiterate Petitioner's contention from his Petition that his plea

in a different case rendered the Order of Protection null and void because the Order was

"predicated upon the court's continuing jurisdiction over the ac[c]used." (Pet'r's Obj's I at 9–

10; *see also id.* at 8 (noting that the "[e]vidence submitted in [his] habeas [Petition] proves [the]

nullity of [the Order of Protection]").)  Construing his Objections liberally, the Court finds that

Petitioner objects to Magistrate Judge Davison's recommendation on the grounds that Petitioner

argued that the Order of Protection was a nullity at trial, thus exhausting the claim. (*See id.* at

13.)  But Petitioner himself concedes that any claim about the validity of the Order of Protection

"was not [made] in the appellate court." (*Id.*)  Because Petitioner "must have utilized all

available mechanisms to secure [state] *appellate review* of the denial of th[e] claim," *Klein*, 667

F.2d at 282 (emphasis added), Petitioner's claim is unexhausted. Aside from his actual innocence claim discussed above, Petitioner does not object to Magistrate Judge Davison's conclusion that the claim should be deemed exhausted and procedurally defaulted because it is procedurally barred under state law.[26] The Court finds no error, clear or otherwise, with respect to this determination and thus adopts the recommendation and denies Petitioner's claim.[27]

### 7. Ineffective Assistance of Counsel

#### a. Trial Counsel

Petitioner asserts that his trial counsel was constitutionally ineffective for failing to: (1) argue that his conviction was based on false evidence and perjured testimony, (2) preserve Petitioner's *Rosario* claim, (3) argue that the Order of Protection was a nullity, and (4) provide to the trial court additional evidence—specifically, an investigator's report—that allegedly would have led to the issuance of a missing witness charge. (*See* Am. Pet. ¶ 12 (Ground Four); R&R 26–27.) Magistrate Judge Davison noted that all four of the claims were unexhausted. (*See* R&R 27.) Magistrate Judge Davison further concluded that the first three components of the claim could be deemed exhausted and procedurally defaulted because they were record-based claims that could have been brought on Petitioner's direct appeal and thus are now procedurally

---

[26] Petitioner notes that "the procedural defaults and rules and laws[] [were] not familiar to [him]." (Pet'r's Obj's I at 2.) But as Petitioner himself concedes "that is not enough to use for [his] opposition motion." (*Id.* at 3.) Indeed, "Petitioner's allegation of ignorance of the law . . . [is] insufficient to allege adequate cause to excuse [a] procedural default." *White v. West*, No. 04-CV-2886, 2010 WL 5300526, at *19 (E.D.N.Y. Dec. 6, 2010); *see also James*, 996 F.2d at 1447 ("Ignorance or inadvertence will not constitute 'cause.'" (citing *Murray*, 477 U.S. at 491)); *Parker v. Wenderlich*, No. 14-CV-5896, 2015 WL 5158476, at *10 (E.D.N.Y. Sept. 2, 2015) ("[The petitioner's] lack of familiarity with the law is not sufficient cause to excuse [the petitioner's] default.").

[27] Moreover, for the reasons noted above, Petitioner has not demonstrated that the Order of Protection was invalid.

barred under state law. (*Id.* at 27–28.)[28]  Magistrate Judge Davison concluded that the fourth

component, related to the missing witness charge, was not procedurally barred, but should be

denied because the claim was plainly meritless. (*Id.* at 28–30.)  Petitioner's Objections do not

directly challenge Magistrate Judge Davison's conclusions with respect to the procedural

defaults or the merits of the missing witness component of the claim. (*See generally* Pet'r's

Obj's III at unnumbered 1–4; *see also* Pet'r's Obj's I at 17.)[29]  Finding no error, clear or

otherwise, the Court adopts Magistrate Judge Davison's recommendation and denies these

claims.[30]

---

[28] As discussed above with respect to Petitioner's freestanding false evidence claim,
Petitioner's ineffective assistance claim regarding counsel's alleged failure to argue that his
conviction was based on false evidence may rely on facts outside of the record and thus could
arguably be the subject of a collateral suit under N.Y. Crim. Proc. Law § 440.10.  However, even
if the claim is not procedurally barred and thus remains unexhausted, it can still be denied by this
Court as plainly meritless.  As the Second Circuit has noted, a petitioner cannot show the
prejudice necessary to prevail on an ineffective assistance claim "if the claim or objection that an
attorney failed to pursue lacks merit." *Harrington v. United States*, 689 F.3d 124, 130 (2d Cir.
2012).  As the Court has already determined, Petitioner has failed to demonstrate that the officers
provided any false testimony as to the police station incident.  Counsel's alleged failure to argue
that Petitioner's conviction was based on false evidence thus could not have prejudiced
Petitioner and Petitioner's ineffective assistance claim is denied as plainly meritless.

[29] Though it is difficult to tell, Petitioner's Objections can be construed as attempting to
make an objection to the procedural default finding when he says that "[t]he last appeal was to
[H]on[o]rable C.M. Bartlett's dismissal of my case.  The brief for those appeals do hold
favorable information of provi[]ng procedural defaults." (Pet'r's Obj's III at unnumbered 4.)
Petitioner's apparent contention that he somehow exhausted his claims of ineffective assistance
of counsel, or any claim, by raising them in appellate briefing in connection with the
prosecution's appeal of the trial court's suppression ruling does not solve his procedural default
issues because it does not demonstrate that he exhausted any of his claims by "utiliz[ing] all
available mechanisms to secure [state] appellate review of the denial of [his federal
constitutional] claim[s]." *Klein*, 667 F.2d at 282.

[30] Not only did Petitioner fail to object to any of Magistrate Judge Davison's specific
recommendations, but the section of Petitioner's Objections addressing the ineffective assistance
of counsel claims is particularly incoherent and contradictory.  For example, Petitioner asserts
that "the evidence was before the lawyer to use.  The ammunition[] to exonerate [Petitioner]."
(Pet'r's Obj's III at unnumbered 3.)  Setting aside the ambiguity as to what "evidence" Petitioner
is describing, the *very next sentence* continues that the lawyer "never used this [evidence]

### b.  Appellate Counsel

Magistrate Judge Davison construed the Petition as also arguing that appellate counsel was ineffective for failing to fully argue that (1) Petitioner's conviction was based on false evidence, and (2) the Order of Protection was invalid. (*See* R&R 31; *see also* Am. Pet. Part 2 at 3–4; Am. Pet. Part 3 at 12.)  Petitioner's Objections do not specifically address these claims. The Court has reviewed Magistrate Judge Davison's determination with respect to the two claims and finds no error, clear or otherwise.[31]  The Court thus adopts those recommendations and denies the claims.

### III.  Conclusion

The Court adopts Magistrate Judge Davison's R&R.  Petitioner's writ of habeas corpus is accordingly dismissed with prejudice.

As Petitioner has not made a substantial showing of the denial of a constitutional right, a Certificate of Appealability shall not be issued, *see* 28 U.S.C. § 2253(c)(2); *Lucidore v. N.Y. State Div. of Parole*, 209 F.3d 107, 111–12 (2d Cir. 2000), and the Court further certifies,

---

[be]cause it was not turned over to the attorney." (*Id.*)  Petitioner also contends that "[i]t is very well preserved that the Dunnaway/Huntely [sic] Hearing testimony was never afforded to the defen[s]e attorn[e]y." (*Id.*)  But Petitioner's attorney *participated* in the *Dunaway/Huntley* hearing; obviously no transcript of that hearing was kept from his attorney.

[31] Even if the Court considered Petitioner's claim on the merits, it would still fail.  In order to establish a claim for ineffective assistance of counsel, a habeas petitioner must satisfy a two-part test. First, Petitioner must demonstrate that his attorney's performance "fell below an objective standard of reasonableness" and second, that there is a "reasonable probability," that, but for counsel's error, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). "Although the *Strickland* test was formulated in the context of evaluating a claim of ineffective assistance of trial counsel, the same test is used with respect to appellate counsel." *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir. 1994). Because there was no perjurious testimony at trial and the Order of Protection was valid, appellate counsel's decision not to fully argue the false evidence and Order of Protection claims on appeal cannot have been objectively unreasonable. *See, e.g.*, *Wheeler v. Phillips*, No. 05-CV-4399, 2006 WL 2357973, at *15 (E.D.N.Y. Aug. 15, 2006) ("Counsel cannot be deficient for failing to raise meritless claims at trial or on appeal.") (collecting cases).

pursuant to 28 U.S.C. § 1915(a)(3), that an appeal from this judgment on the merits would not be taken in good faith, *see Coppedge v. United States*, 369 U.S. 438, 445 (1962) ("We consider a defendant's good faith . . . demonstrated when he seeks appellate review of any issue not frivolous."); *Burda Media Inc. v. Blumenberg*, 731 F. Supp. 2d 321, 322–23 (S.D.N.Y. 2010) (citing *Coppedge* and noting that an appeal may not be taken in forma pauperis if the trial court certifies in writing that it is not taken in good faith).

The Clerk of the Court is respectfully directed to enter a judgment in favor of Respondent and to close the case.

SO ORDERED.

DATED:     January **13**, 2016
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE